UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
VALRICK JOHNSON,

                      Plaintiff,                    04 Civ. 5574 (HB)

                - v-                        **OPINION & ORDER**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                      Defendant.
-------------------------------------------------------------------------X

**Hon. HAROLD BAER, JR., District Judge:**

      Valrick Johnson, pro se, brings this action pursuant to 42 U.S.C. Sections 405(g) and 1383(c), to challenge the final determination by the Commissioner of Social Security ("Commissioner") that he was not "disabled" within the meaning of the Social Security Act prior to November 14, 2001. While Johnson seeks Supplemental Security Income ("SSI") benefits as far back as 1993, his eligibility onset is June 5, 2000, as explained below. The Commissioner moves and Johnson cross-moves for judgment on the pleadings. For the following reasons, the Commissioner's motion is granted and Johnson's motion is denied.

## I. BACKGROUND

**A.**    **Plaintiff's Background**

      Born in Jamaica in 1955, Johnson married a United States citizen at age twenty-seven and has since lived in the United States as a lawful permanent resident. 09/09/04 Transcript of Administrative Record of Social Security Administration ("Tr.") at 115, 532. Separated from his wife, Johnson has one son whom he has not seen since the child was seventeen months old, seventeen years ago. Tr. at 594-95.

      Johnson attended school through eleventh grade. Tr. at 131. From 1985 through 1992, he worked as a security guard, machine operator, factory assembly person, furniture mover, bricklayer, and carpenter. He last worked as a boner for a butcher in 1992. Tr. at 136.

      On New Year's Eve 1992, on his way home from a club, Johnson was shot in the abdomen. Tr. at 145, 532. He began to experience back pain and stopped work. Tr. at 145-46. From 1996 to February 2000, Johnson was imprisoned for felony substance abuse. Tr. at

1

159, 543. Subsequently, Johnson was again jailed from July 25, 2000 to October 27, 2000. Tr. at 557-58. The record does not reveal the reason for this incarceration. Johnson presently lives alone in a rented room in Newburgh, New York. Tr. at 116.

B. **Evidence from Medical Reports**

   1. **Physical Health**

In February 2000, Johnson sought treatment at the emergency room at St. Luke's Hospital for migraine, but a CT scan of his brain taken the following month showed no abnormalities. Tr. at 203, 206. Johnson returned to St. Luke's on March 23, 2000, complaining of swelling of his left leg. Tr. at 200. The next day, however, Johnson told doctors at the Family Health Center of Newburgh that the swelling had subsided. Tr. at 178. Johnson visited the Family Health Center from March to May 2000, and reported chills, dizziness, headaches, penile discharge, and hip and back pain. Tr. at 174-79. Clinical findings were, however, normal or clinically insignificant. Tr. at 182-88.

Johnson sought welfare benefits from New York State in January 2001. Tr. at 552. On June 18, 2001, Dr. Edward Thaler, Johnson's treating physician for the past two months, informed the New York State Department of Social Services that Johnson had no physical disabilities at that time. Tr. at 542. Based on this report, an official at the Orange County Department of Social Services noted that Johnson was employable. Tr. at 541.

From September to October 2001, Johnson received treatment at Middletown Medical Center. Tr. at 512-24, 601-02. On October 15, 2001, an attending physician there, Dr. Alexander Gapay, noted that Johnson had "moderate partial disability" and could not go back to construction work. Tr. at 514. Dr. Robert Stoller, an orthopedist who examined Johnson on November 10 and December 7, 2001, also stated that Johnson was "not able to do his former occupation of construction work and [was] totally disabled reference this." Tr. at 278. Dr. Stoller observed that a bullet lodged in Johnson's back, about a half inch from his spine, reduced the motion of the lumbo-sacral spine to 60% of the normal range. Id.

At the direction of the Appeals Council of the Social Security Administration ("SSA"), Dr. Raja Jagtiani examined Johnson on April 29, 2003. Tr. at 645-53. Dr. Jagtiani assessed that Johnson had moderate limitations with lifting and carrying heavy weights, and with prolonged standing, walking, and sitting. Tr. at 648. He also considered that Johnson had mild limitations in climbing, kneeling, balancing, crouching, crawling, and stooping. Id.

He recommended that Johnson avoid activities requiring pushing and pulling. Id.

### 2. Hearing

A January 1998 hearing test disclosed that Johnson's right ear was essentially normal, but that his left ear had a moderate to severe profound hearing loss. Tr. at 255, 258. The results of a test three years later, in February 2001, were essentially the same. Tr. at 458. Nonetheless, this test revealed that Johnson had excellent word recognition ability in both ears—100% in his right ear and 92% in his left ear. Id.

### 3. Psychological Health

From April through June 2000, Johnson was treated at the Pius XII Chemical Dependency Program twice a week. Tr. at 210. A July 13, 2000 report noted that Johnson was clear, coherent, and relevant. Tr. at 212. His attention and concentration were organized, and he had no delusions, hallucinations, or suicidal or homicidal ideation. Id. Moreover, he had no limitations with understanding and memory, sustained concentration and persistence, social interaction, or adaption. Tr. at 214.

Subsequently, Johnson's psychological state deteriorated. Beginning November 14, 2001, Amanda Swindon, a mental health therapist at Family Counseling of Occupations, Inc., conducted a psycho-social evaluation of Johnson. Tr. at 530-31, 534. She rated Johnson's Global Assessment of Functioning ("GAF") at 40,[1] and assessed major depression, intermittent explosive disorder, and paranoid personality disorder. Tr. at 531. On January 28, 2002, Ms. Swindon noted in a questionnaire for Johnson's attorney that Johnson would have difficulty working at a regular job on a sustained basis, and explained that he was poorly motivated, highly suspicious of others' intentions, and quick to be hostile and socially inappropriate. Tr. at 616. Also on January 28, 2002, Dr. Leon Krakower, a psychiatrist at Family Counseling, examined Johnson. Tr. at 620-26. He diagnosed paranoid schizophrenia and confirmed Ms. Swindon's GAF rating of 40. Tr. at 620-22. On March 25, 2002, Dr. Krakower and Ms. Swindon stated in a questionnaire that Johnson would be unable to tolerate even low stress jobs because of his severe mental illness. Tr. at 634.

At the Appeals Council's directive, Dr. Leslie Helprin performed a psychological

---

[1] A GAF of between 31 and 40 indicates some impairment in reality testing or communication, or major impairment in several areas such as judgment and mood. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).

evaluation of Johnson on April 29, 2003. Tr. at 654-58. Dr. Helprin observed that Johnson was often incoherent and vague, and that his attention, concentration, and memory skills were impaired. Tr. at 656. In his medical source statement, he noted that Johnson would have difficulty understanding simple directions, performing simple rote tasks, relating adequately with others, or dealing appropriately with stress. Tr. at 657. Dr. Helprin diagnosed schizoaffective disorder and paranoid personality disorder. Id.

**C.     Procedural Posture**

Johnson applied for SSI on June 5, 2000, alleging various physical impairments. Tr. at 24. A hearing was held on March 4, 2002 before an Administrative Law Judge ("ALJ"). Id. The ALJ found that Johnson was under a "disability" beginning November 14, 2001. Id. The Appeals Council remanded to obtain consultative internal medicine and mental status examinations with medical source statements of Johnson's ability to do work-related functions. Tr. at 25. The ALJ again concluded, in a decision issued on August 25, 2003, that Johnson was "disabled" because of his psychiatric impairment beginning November 14, 2001. Tr. at 25, 32-33. This became the final decision of the Commissioner on March 25, 2004, when the Appeals Council denied Johnson's request for review. Tr. at 8-10.

Reading the Complaint and Johnson's supporting submission liberally, Johnson makes the following claims: (i) his attorney rendered ineffective assistance at the SSA hearing because he failed to request subpoenas; (ii) the SSA owes him a lump sum SSI back payment; and (iii) he should be found "disabled" from 1993 onwards.

As a preliminary matter, Johnson's first claim is meritless because, unfortunately perhaps, there is no right to competent counsel in Social Security proceedings. See Bovino v. Comm'r of Soc. Sec., No. 97 Civ. 2496, 1998 WL 812596, at *4 (E.D.N.Y. Apr. 8, 1998) (citing Banta v. Chater, No. CIV-94-1754-A, 1995 WL 864573, at **1-3 (W.D. Okla. Dec. 1, 1995) aff'd 94 F.3d 655 (10th Cir. 1996) (unpublished opinion)). Moreover, the Second Circuit has held that it is within the ALJ's discretion whether to grant a claimant's request to subpoena reporting physicians. See Yancey v. Apfel, 145 F.3d 106, 113 (2d Cir. 1998). The ALJ does not abuse this discretion when the claimant has had a fair and meaningful opportunity to present his case, there is no indication that the physicians' reports were inaccurate or biased, and subpoenaing physicians would not add anything of value to the proceedings. See id. Here, the record demonstrates that the ALJ allowed Johnson a fair and

4

meaningful opportunity to present his case, even holding the record open for a month after the administrative hearing so that Johnson could submit any remaining medical reports. Tr. at 664. Further, the record does not indicate any inaccuracies or bias in the physicians' reports, nor that subpoenaing physicians[2] would have aided Johnson's position.

As to Johnson's second claim, this Court lacks jurisdiction to review the payment dispute because the Commissioner has not rendered a final decision on that issue. See 42 U.S.C. § 405(g) (Supp. 2005). Finally, turning to Johnson's third claim, SSI benefits are not payable prior to the filing of an SSI application, nor are prison inmates eligible for SSI benefits during their incarceration. See 20 C.F.R. §§ 416.330 & 416.335 (2005); 42 U.S.C. § 1382(e) (Supp. 2005); 20 C.F.R. § 416.211 (2005). Therefore, Johnson would only be eligible for SSI benefits from June 5, 2000, the date of his SSI application, with the exception of July 25, 2000 to October 27, 2000, one of the periods he was incarcerated. Consequently, the only issue before this Court is whether substantial evidence supports the ALJ's decision that Johnson was "disabled" only from November 14, 2001, and not from June 5, 2000.

## II. DISCUSSION

### A. Standard of Review

This Court reviews the record to "determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The substantial evidence standard applies to the ALJ's findings of fact, inferences, and conclusions. See Flors v. Massanari, No. 00 Civ. 5767, 2002 WL 100631, at *3 (S.D.N.Y. Jan 25, 2002).

### B. Plaintiff's Burden of Proof

A plaintiff who seeks benefits must prove that he suffers from a disability by showing that "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A) (Supp. 2005). The inability to engage in gainful

---

[2] Because Johnson does not identify which physicians should have been subpoenaed, I assume he means all physicians whose findings failed to support his claim of disability.

5

activity, not just the debilitating medical condition, must continue for a period of at least twelve months. See Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

**C.     ALJ's Decision Was Supported by Substantial Evidence**

The ALJ evaluated Johnson's claim pursuant to the five-step procedure set forth in 20 C.F.R. Section 416.920(a). In accordance with this procedure, the ALJ found that Johnson: (i) had not engaged in any substantial gainful activity since June 5, 2000; (ii) had severe low back pain, mild left-sided hearing loss, schizoaffective disorder-depressed type, and paranoid personality disorder; (iii) had no impairments that met or equaled the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (iv) had the residual functional capacity to perform light work[3] which did not require keen bilateral hearing, but could not perform heavy or strenuous work; and (v) was able to perform light work from June 5, 2000 through November 13, 2001, considering his age, education, and work experience, but from November 14, 2001, was disabled because of his severe psychiatric impairment. Tr. at 28, 31-32.

### 1.     Finding of No Disability From June 5, 2000 to November 13, 2001

Substantial evidence supports the ALJ's decision that Johnson was able to perform light work that did not require keen bilateral hearing from June 5, 2000 through November 13, 2001, and hence was not disabled. Despite Johnson's complaints of various ailments from February to May 2000, the medical records from St. Luke's Hospital and the Family Health Center of Newburgh reveal clinical findings that were normal or clinically insignificant. In light of these findings, the ALJ reasonably concluded that Johnson's allegations of pain were not credible to the incapacitating extent claimed. Further, in June 2001, Johnson's treating physician rendered his opinion that Johnson had no physical disabilities.

Beginning in October 2001, the record contains some evidence of physical impairment. Dr. Stoller noted some motion limitation in Johnson's lumbo-sacral spine, and both Dr. Stoller and Dr. Gapay stated that Johnson was unable to return to construction work. The ALJ took this evidence into account when he concluded that Johnson could not perform

---

[3] Light work involves frequent lifting of no more than twenty pounds at a time, or carrying objects up to ten pounds. A job falls in this category when, regardless of the weight lifted, it requires a good deal of walking or standing, or involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. § 416.967(b) (2005). Light work also encompasses sedentary work. Id.

work that required heavy lifting or strenuous physical exertion. This evidence is not inconsistent, however, with the ALJ's determination that Johnson could perform light work.[4]

Finally, the evidence that Johnson suffered moderate to severe hearing loss in his left ear, but that he had excellent word recognition ability in both ears, supports the ALJ's decision that this impairment did not prevent all work activity, but only work that required keen bilateral hearing.

### 2. Finding of Disability from November 14, 2001

Substantial evidence also supports the ALJ's decision that Johnson was disabled from November 14, 2001 because of his psychiatric impairment. Dr. Helprin's statement that Johnson would have difficulty understanding simple directions or performing rote tasks substantiates the ALJ's conclusion that Johnson would be unable to perform any work on a sustained, competitive basis from April 23, 2003 onwards. Further, because Ms. Swindon's and Dr. Krakower's observations of Johnson's psychological state accorded with those of Dr. Helprin, there was substantial evidence that Johnson's psychiatric impairment had been ongoing since November 14, 2001, when he commenced treatment at Family Counseling. Finally, the evidence supports the ALJ's determination that Johnson had no psychiatric limitations prior to November 14, 2001. Indeed, the July 2000 report from the Pius XII Chemical Dependency Program shows that Johnson was psychologically sound at that time.

### III. CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings, to affirm the Commissioner's decision, is granted. Johnson's cross-motion for judgment on the pleadings, to remand the case to the Commissioner, is denied. The Clerk of the Court is instructed to close this motion and remove this case from my docket.

**IT IS SO ORDERED.**
**New York, New York**
**October ___, 2005**

_____
U.S.D.J.

---

[4] Dr. Jagtiani's assessment that Johnson had moderate limitations with prolonged standing, walking, and sitting, and that he should avoid activities involving pulling and pushing, may be inconsistent with a ruling that Johnson could perform light work. Dr. Jagtiani's evaluation of April 29, 2003, however, falls outside the period at issue.